UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| TANYA MARIA WIGGINS, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | CASE NO. 3:13CV1181 (MPS) |
| : | |
| CAROLYN W. COLVIN, Acting : | |
| Commissioner, Social Security : | |
| Administration, : | |
| : | |
| Defendant. : | |

**RULING ON PENDING MOTIONS**

In this Social Security case, the plaintiff challenges the Acting Social Security Commissioner's denial of disability benefits, arguing among other things that the Administrative Law Judge ("ALJ") violated the "treating physician rule" by failing to articulate her reasoning adequately and by according too little weight to the opinions of the plaintiff's treating physicians. Because I agree on both counts, I reverse the Acting Commissioner's determination denying benefits and remand the case to the Social Security Administration ("S.S.A.") for further proceedings consistent with this opinion. I therefore GRANT IN PART the plaintiff's Motion for Judgment on the Pleadings (ECF No. 10) and DENY the defendant's Motion for an Order Affirming the Commissioner's Decision (ECF No. 14). I do not reach the plaintiff's remaining arguments urging reversal.

**I.  PROCEDURAL HISTORY AND FACTS**

The procedural history of the case, the medical evidence of the plaintiff's mental impairments and headaches, the opinions of the plaintiff's physicians and the state agency doctors, the plaintiff's testimony, the vocational expert's testimony, and the ALJ's decision are

all summarized in a stipulation of facts filed by the parties (ECF No. 17), which the Court adopts and incorporates by reference herein.

Specific facts and portions of the ALJ's decision will be discussed below as necessary.

## II. LEGAL STANDARDS

The regulations promulgated by the Commissioner establish a five-step analysis for evaluating disability claims. *Bowen v. Yuckert,* 482 U.S. 137, 140–142, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); 20 C.F.R. §§ 404.1520, 416.920. First, the Commissioner considers if the claimant is presently working in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). If not, the Commissioner next considers if the claimant has a medically severe impairment. *Id.* § 416.920(a)(4)(ii). If the severity requirement is met, the third inquiry is whether the impairment is listed in Appendix 1 of the regulations or is equal to a listed impairment. *Id.* § 416.920(a)(4)(iii); *Id.* pt. 404, subpt. P, App. 1. If so, the disability claim is granted. If not, the fourth inquiry is to determine whether, despite the severe impairment, the claimant's residual functional capacity ("RFC") allows him or her to perform any past work. *Id.* § 416.920(a)(4)(iv). If a claimant demonstrates that no past work can be performed, it then becomes incumbent upon the Commissioner to come forward with evidence that substantial gainful alternative employment exists that the claimant has the RFC to perform. *Id.* § 416.920(a)(4)(v). If the Commissioner fails to come forward with such evidence, the claimant is entitled to disability benefits. *Alston v. Sullivan,* 904 F.2d 122, 126 (2d Cir.1990); *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982).

The ALJ found, and neither party disputes, that the plaintiff suffers from severe, non-listed impairments, namely, migraine headaches, alcohol abuse (in remission), and depression. (Administrative Record, p. 307 ("R-307")). The issues in this case focus on whether, in spite of

these impairments, the ALJ properly determined, in connection with Step Four, that the plaintiff had the RFC to "perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [the plaintiff] is able to carry out and complete simple instructions and simple work," the plaintiff "has adequate concentration, persistence and pace for 2 hour periods in an 8 hour workday," the plaintiff "cannot interact with the public or work at a production rate pace but can perform goal oriented work," and the plaintiff "is limited to work in a quiet noise environment." (R-309.)

District courts perform an appellate function when reviewing a final decision of the Commissioner under 42 U.S.C. § 405(g). *Zambrana v. Califano,* 651 F.2d 842, 844 (2d Cir.1981). A reviewing court will uphold an ALJ's decision unless it is based upon legal error or is not supported by substantial evidence. *Balsamo v. Chater,* 142 F.3d 75, 79 (2d Cir.1998). "'Substantial evidence' is less than a preponderance, but 'more than a mere scintilla' and as much as 'a reasonable mind might accept as adequate to support a conclusion.'" *Grossman v. Astrue,* 783 F .Supp.2d 300, 303 (D.Conn. 2010) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

### III.   ANALYSIS

#### A.   *Treating Physician Rule*

##### 1.   Opinions Concerning the Plaintiff's Depression

The plaintiff first argues that the ALJ failed to indicate whether or not she considered the opinions of the plaintiff's long-time licensed professional counselor, Jon Stern ("Mr. Stern"), which were co-signed by a psychiatrist and which consistently described the plaintiff as having serious limitations in work-related capacities as a result of her depression, to qualify for the special consideration afforded the opinions of treating physicians under the "treating physician

rule." Under that rule, courts give the opinions of treating physicians and other "acceptable medical sources" controlling weight as long as they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with" other substantial evidence in the record. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). As a licensed professional counselor, Mr. Stern is not himself a treating physician or other "acceptable medical source," 20 C.F.R. Sec. 404.1513(a), but the co-signing of his opinions by a psychiatrist raises the prospect that they should be evaluated under the treating physician rule. *See, e.g., Godlin v. Astrue*, No. 3:11-cv-881(SRU), 2013 WL 1246791, at *3 (D. Conn. March 27, 2013) ("Here, as in *Payne* [*Astrue*, No. 3:10-CV-1565(JCH), 2011 WL 2471288, at *5 (D. Conn. June 21, 2011)], there is no apparent indication that the opinion was not independently considered and endorsed by the co-signing physician and, as a result, the ALJ should have explained whether or not he considered these opinions to be the opinions of an appropriate medical source, and if not, then why." (internal quotation marks omitted)).

While the ALJ acknowledged that Mr. Stern's opinions were co-signed by a psychiatrist (R-311), it is, at best for the Commissioner, unclear whether she evaluated those opinions under the treating physician rule. The opinions themselves include, in one case, not only a signature by a psychiatrist but a reference to seeing the plaintiff for "medication management" on a monthly basis, as well as weekly individual counseling sessions. (R-1028.) While the opinions also refer to, and include the signature of, an advanced practice registered nurse ("APRN")[1]—who may have provided some or all of the "medication management" in this case (*see, e.g.,* R-898-938)— the ALJ made no findings on whether it was the psychiatrist who provided monthly medication

---

[1]APRN is a designation that allows for the prescribing of medication (*see* Conn. Gen. Stat. § 20-87a(b)(2) (APRNs "may, in collaboration with a physician licensed to practice medicine in this state, prescribe, dispense and administer medical therapeutics and corrective measures")) and is not an "acceptable medical source" under Social Security regulations. 20 C.F.R. Sec. 404.1513(a).

management or whether the psychiatrist otherwise examined the plaintiff, supervised the licensed professional counselor and/or APRN, simply reviewed the records, or played some other role. *See, e.g., Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996) (finding that nurse practitioner's opinion was "properly considered as part of the opinion" of a physician who, though he did not personally examine the plaintiff at the relevant time, closely supervised the nurse practitioner in the plaintiff's treatment).

After acknowledging in passing that the opinions were co-signed by a psychiatrist, the ALJ repeatedly called them "Mr. Stern's opinions," made no mention of the treating physician rule, and failed to assess whether the opinions were inconsistent with other substantial evidence in the record. More specifically, the ALJ did not "explicitly consider" the factors she was required to consider in order to "override the opinion of the treating physician," i.e., "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 703 F.3d 409, 418 (2d Cir. 2013).[2] Instead, the ALJ dismissed "Mr. Stern's" opinions in a single sentence: "Mr. Stern's opinions are given little weight because the treatment notes fail to document the type of

---

[2] As the plaintiff points out, the ALJ's failure to consider these factors would warrant remand even if the ALJ had properly determined that Mr. Stern's opinions were not, in fact, the opinions of the psychiatrist or did not otherwise emanate from an "acceptable medical source." Regulations of the S.S.A. call for application of substantially the same factors listed in *Selian* when considering the opinions of "other medical sources," such as licensed professional counselors. SSR 06-03P, 2006 WL 2329939, at *4 (Aug. 9, 2006) (directing consideration of factors including "how long the source has known and how frequently the source has seen the individual," "how consistent the opinion is with other evidence," "the degree to which the source presents relevant evidence to support an opinion," "how well the source explains the opinion," and "whether the source has a specialty or area of expertise related to the individual's impairment" in evaluating opinion evidence from other medical sources, because "[t]hese factors represent basic principles that apply to the consideration of all opinions from medical sources …."). Although opinions from medical sources that are not "acceptable medical sources" do not qualify for the special status, and potentially controlling weight, accorded to the opinions of treating physicians, they must nonetheless be considered on "the severity of the individual's impairment and how it affects the individual's ability to function." *Id.* at *2.

significant clinical abnormalities, such as low global assessment of functioning score, disturbances of orientation and perception and thought processes and psychiatric hospitalizations, one would expect if the [plaintiff] were in fact as extremely limited as opined." (R-312.)

The ALJ's curt dismissal of "Mr. Stern's opinions" does not, as the defendant now suggests, amount to a finding that they were inconsistent with substantial evidence in the record. Rather, it reflects an improper medical judgment by the ALJ about the types of symptoms, treatment, and test results that, in the ALJ's view, "one would expect" to find in a person who suffered from the same impairments as the plaintiff and whose work capacity was as restricted as Mr. Stern (and perhaps his colleagues) found the plaintiff's to be. *Balsamo*, 142 F.3d at 81 ("[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion . . . . While an ALJ is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who submitted an opinion to or testified before him." (citation and internal quotation marks omitted)); *Garcia v. Barnhart*, No. 01 CIV.8300 GEL, 2003 WL 68040, at *6 (S.D.N.Y. Jan. 7, 2003) ("The ALJ must defer questions requiring medical expertise to physicians instead of substituting his own medical conclusions for those already present in the record, for a circumstantial critique by a non-physician . . . must be overwhelmingly compelling to justify a denial of benefits." (internal quotation marks and citation omitted)). The ALJ cites no medical opinion or authority for her suggestion that a person whose ability to cope with the demands of work is severely limited as a result of depression must also have exhibited "disturbances of orientation and perception and thought processes" or undergone "psychiatric hospitalizations." (R-312.) There is at least some reason to question such a notion. *See Adkins v.*

6

*Astrue*, 2010 WL 3782388, at *9 (N. D. Ind. Sept. 21, 2010) ("Because there is no evidence in the record that severe mental impairments necessarily (or even generally) result in hospitalization, and that conclusion seems untenable, this Court concurs with Adkins that his lack of hospitalization was not a proper basis for discrediting his testimony regarding his symptoms."); Diagnostic and Statistical Manual of Mental Disorders Fifth Edition ("DSM-5") 160-61 (2013) (not listing psychotic features or other "disturbances of orientation and perception and thought processes" among necessary criteria for diagnosis of "Major Depressive Episode"). And the citations the ALJ does offer in support of her musings on psychiatry refer in some cases to medical records that, if anything, confirm the view that the plaintiff's functional capacity is severely limited. (R-312, citing Ex. 19F p. 2 (plaintiff has "symptoms of depression including . . . low energy, low motivation, decreased sleep, crying spells, feeling easily overwhelmed . . . . [plaintiff] reports continued stress and depression with frequent headaches and reports continued neurovegetative symptoms of depression.").) In other cases, the ALJ's citations refer to medical records that do not exist. (R-312, citing pages 18, 19, 20, 22, 24 and 25 of Exhibit 10F, which consists of 17 pages).

      That leaves the ALJ's reliance on the absence of a "low global assessment of functioning score" (R-312), which is a slim reed on which to ground conclusions about disability. The S.S.A. has never viewed GAF scores as dispositive, *see, e.g., Revised Medical Criteria for Evaluation Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50,746-01, 50,764-65 (Aug. 21, 2000) ("The GAF scale … does not have a direct correlation to the severity requirements in our mental disorders listings."), and it has recently further qualified the weight they should receive. S.S.A. AM-13066, July 22, 2013 (stating that the SSA treats the GAF score as opinion evidence but noting that "the extent to which an adjudicator can rely on the GAF rating as a measure of

impairment severity and mental functioning depends on whether the GAF rating is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise" and that "[t]he problem with using the GAF to evaluate disability is that there is no way to standardize measurement and evaluation."). The American Psychiatric Association has dropped the GAF scale from the most recent version of the DSM. DSM-5 at 16 ("It was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice."). And courts in this Circuit have criticized ALJs for relying on GAF scores alone as a basis for rejecting a treating opinion. *Alsheikmohammed v. Colvin*, No. 6:14-cv-461(GTS), 2015 WL 4041736, at *8 (N.D.N.Y. July 1, 2015) ("[T]he ALJ erroneously placed significant emphasis on Plaintiff's GAF score of 60 as definitive support of his reasoning in affording her opinion less weight. Although a GAF score is opinion evidence, it should be considered in the context of the record and not as a stand-alone indicator of Plaintiff's ability (or inability) to function."); *Beck v. Colvin*, No. 6:13-cv-6014(MAT), 2014 WL 1837611, at *10 (W.D.N.Y. May, 2014) ("To the extent the ALJ rejected the opinion as incompatible with the GAF score, the ALJ failed to explain why a single GAF score, which is a generalized assessment, superseded Dr. Yu's more precise opinion regarding Plaintiff's ability to perform work-related activities.").

Finally, the GAF score of 53 referred to in the records cited by the ALJ (R-312, citing Ex. 7F pp. 10, 13 and 16)[3] does not necessarily conflict with the opinions of Mr. Stern (and perhaps his colleagues, *see supra*) about the plaintiff's limitations. According to the Diagnostic and Statistical Manual of Mental Disorders Fourth Edition ("DSM-4"), a score of 53 is at the more

---

[3] Although the Commissioner points to one page in the record in which the plaintiff's highest GAF score during the past year was listed as 58, the medical records cited by the ALJ and in the Commissioner's brief reflect that each time she was actually seen or an evaluation was actually done her GAF score was either 52 or 53. (*see, e.g.,* R-597, R-669, R-672, R-675 R-853, R-1028).

serious end of the range of "moderate symptoms" and "moderate difficulty" in functioning, which may include "flat affect," "occasional panic attacks," and "conflicts with peers or co-workers," and is approaching the range of "serious symptoms" and "serious impairment" in functioning, which may include "suicidal ideation" and "unable to keep a job." DSM-4 32 (2000). Especially as a rough, short-hand designation, *see* S.S.A. AM-13066, July 22, 2013, at 4 ("[t]he GAF scale anchors are very general and there can be a significant variation in how clinicians rate a GAF."), this score is not out of line with the opinions of Mr. Stern (and perhaps his colleagues) that the plaintiff has "difficulty concentrating, tolerating frustration, increased irritability," that she has a history of "suicidal thoughts," (R-1028) and that she is "seriously limited," "unable to meet competitive standards," or has "no useful ability to function" in a variety of work-related capacities, including "work[ing] in coordination with or proximity to others without being unduly distracted" and "complet[ing] a normal workday and workweek without interruptions from psychologically based symptoms." (R-1030).

In short, the ALJ failed to indicate whether she considered "Mr. Stern's opinions" to be those of a treating physician, failed to consider the factors for weighing those opinions, and rejected those opinions based on her own medical judgment and other considerations that did not amount to substantial evidence or "good reasons." 404 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").

## 2. Opinions Concerning the Plaintiff's Headaches

Again invoking the treating physician rule, the plaintiff argues that the ALJ should have given controlling weight to the opinions of the treating neurologist, Dr. Jonas, which included opinions that the plaintiff has "persistent daily headaches," and suffers from "pain every day,"

that her symptoms were severe enough to interfere with attention and concentration "constantly," that the plaintiff "cannot function normally," and that the plaintiff would have to take "unscheduled breaks during an 8-hour work day "all the time." (R-940-42). The ALJ gave Dr. Jonas's opinions regarding the plaintiff's functionality only "partial weight," because "the doctor's opinion is not well supported and is inconsistent both internally and with the findings and conclusions documented in the treatment notes." (R-312.) The ALJ supported this criticism, however, with only two observations: (1) "For example, the doctor opines that the claimant is able to stand for up to 2 hours at one time but can stand less than 2 hours of an 8-hour day"; and (2) "Additionally, Dr. Jonas' notes do not contain significant clinical findings or diagnostic testing that one would expect with such extreme limitations." (*Id*.)

The first of these observations misstates the record. Dr. Jonas did not opine that the plaintiff was able to stand for up to 2 hours and her opinions about the plaintiff's ability to remain standing are not contradictory. The portion of the record cited by the ALJ—pages 2-3 of Exhibit 20F (R-941-42)—is a "Physical Residual Functional Capacity Questionnaire" provided by the S.S.A. and completed by Dr. Jonas. (R-941-42.) On page 2, Dr. Jonas circled "0" in response to a question asking "the hours and/or minutes that your patient can stand at one time" and providing a range of choices from zero minutes to "more than 2" hours. On page 3, in response to a question asking "how long your patient can sit and stand/walk *total in an 8-hour working day*," Dr. Jonas checked, under "stand/walk," the response labeled "less than 2 hours"—the least amount of time among the four options provided. These responses are consistent, and nowhere on the questionnaire did Dr. Jonas indicate that the plaintiff "is able to stand for up to 2 hours at one time." (R-312; *see* R-940-43).

10

On appeal, the Commissioner contends that the Court should treat the ALJ's reference as a typographical error, and that "it is apparent" that the ALJ intended to refer to sitting time, rather than standing time, in describing the supposed "internal[]" "inconsisten[cy]" in Dr. Jonas's opinion. (ECF No. 14-1 at 10 n.5; R-312.) This is not persuasive for two reasons. First, the sentence in which the ALJ describes the supposed "inconsistency" refers to "stand" not once but twice. (R-312 ("For example, the doctor opines that the [plaintiff] is able to stand for up to 2 hours but can stand less than 2 hours of an 8-hour day.").) It is thus not "apparent" that the ALJ meant "sit" when she said "stand" twice, and adjusting her opinion in the manner urged by the Commissioner would risk substituting this Court's own rationale for that of the agency, in violation of basic principles of administrative law. *NLRB v. Columbia Univ.*, 541 F.2d 922, 930 (2d Cir. 1976) ("[T]he propriety of the agency's action is to be judged solely by the rationale it advances . . . ." (citing *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Second, and more fundamentally, the adjustment proposed by the Commissioner on appeal would not save the ALJ's decision from reversal. Had the ALJ intended to refer to Dr. Jonas's opinion about sitting time, rather than standing time, she could still not fairly have characterized it as "internally inconsistent," and her opinion would still be without a "good reason" for discounting Dr. Jonas's opinions about the plaintiff's work-related capacities. 404 C.F.R. § 404.1527(c)(2). The first question about sitting time on the questionnaire asks the respondent to "circle the hours and/or minutes that your patient can sit *at one time* . . ." and provides two groups of options for responses—the first group stated in minutes and the second stated in hours. (R-941.) The two groups are set forth apart from each other in a manner that appears calculated to discourage the giving of a combined response in hours and minutes, and the only options in the "hours" group are "1," "2," and "more than 2" hours. *Id.* Dr. Jonas circled 2

11

hours. *Id.* The second question about sitting time is worded a bit differently: "Please indicate how long your patient can sit and stand/walk *total in an 8-hour working day* (with normal breaks)." The options are also different—"less than 2 hours," "about 2 hours," "about 4 hours," and "at least 6 hours." (R-942.) Dr. Jonas checked the space for "less than 2 hours" under "sit." *Id.* Especially given the paucity of available options on the form—and the absence of an invitation or space provided for elaboration—, these responses are not necessarily inconsistent. Putting aside the distinct wording of the questions, the response "2 hours" to the first question, in the absence of more finely graded options for lesser amounts between 1 and 2 hours, would not be inconsistent with the response "less than 2 hours" to the second question if Dr. Jonas's actual opinion were, say, that the plaintiff could sit for one hour and forty-five minutes. To be sure, it is difficult to say what was in Dr. Jonas's mind when she chose "2 hours" and "less than 2 hours," as opposed to "2 hours" and "about 2 hours," but that is precisely the point: The response options on the form do not provide enough information to enable the ALJ to draw the conclusion that Dr. Jonas was being inconsistent and/or sloppy, on the one hand, or literal and/or accurate, on the other. Thus, to the extent the ALJ meant to refer to sitting time, the responses "2 hours" and "less than 2 hours" do not add up to a clear inconsistency, let alone a "good reason" for discounting the narrative opinions expressed by Dr. Jonas at greater length and with more clarity on other parts of the questionnaire. (R-940).

     The ALJ's second observation—that Dr. Jonas's notes "do not contain significant clinical findings or diagnostic testing that one would expect with such extreme limitations" (R-312)—appears to be another expression of the ALJ's own opinions on medical matters. Nowhere does the ALJ specify—let alone cite any medical sources that say—what "clinical findings" or "diagnostic testing" "one would expect to find" in this case. The exhibits she cites include

references to MRI scans showing lesions on the plaintiff's brain. (R-605, 610.) It is unclear what other types of diagnostic testing or clinical findings the ALJ had in mind or what basis she had to believe they were required to support Dr. Jonas's opinions about the plaintiff's ability to perform work-related functions.

Neither of the ALJ's two bases for giving only partial weight to Dr. Jonas's opinions constitutes substantial evidence or "good reason," and the ALJ provided no other specific reasons for discounting those opinions.

***

For the reasons set forth above, the ALJ did not properly analyze the opinions of the plaintiff's treating providers. I therefore remand the case for further proceedings. I do not reach the other grounds for reversal raised by the plaintiff.

IT IS SO ORDERED.

/s/

Michael P. Shea, U.S.D.J.


Dated:     Hartford, Connecticut
           August 25, 2015